# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| ARLENE WEAVER-SHELTON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | CAUSE NO. 1:09-CV-00082 |

## OPINION AND ORDER

Plaintiff Arlene Weaver-Shelton appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Weaver-Shelton applied for SSI on December 31, 2003, alleging that she became disabled nineteen years earlier on January 1, 1985. (Tr. 63-64.) The Commissioner denied her application initially and upon reconsideration, and Weaver-Shelton requested an administrative hearing. (Tr. 36-47.) On June 7, 2007, Administrative Law Judge ("ALJ") Ronald Jordan conducted a hearing at which Weaver-Shelton (who was represented by counsel) testified by video. (Tr. 303-26.) A vocational expert ("VE") also testified. (Tr. 303-26.)

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

On June 21, 2007, the ALJ rendered an unfavorable decision to Weaver-Shelton, concluding that she was not disabled despite the limitations caused by her impairments because she could perform her past relevant work as a cleaner/housekeeper, as well as a significant number of other jobs in the national economy. (Tr. 21-30.) The Appeals Council denied Weaver-Shelton's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-20.) Weaver-Shelton filed a complaint with this Court on March 31, 2009, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II. WEAVER-SHELTON'S ARGUMENTS

Weaver-Shelton alleges five flaws with the Commissioner's final decision. Specifically, Weaver-Shelton claims that the ALJ (1) improperly evaluated whether she met a listing at step three; (2) erred at step four when concluding that she could perform her past relevant work; (3) selectively considered the evidence when assigning her residual functional capacity ("RFC"); (4) improperly evaluated the credibility of her testimony of debilitating limitations; and (5) relied upon a VE's testimony at step five that lacked an adequate evidentiary foundation. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 15-20.)

## III. FACTUAL BACKGROUND[2]

### *A. Background*

At the time of the ALJ's decision, Weaver-Shelton was forty-seven years old, had obtained her GED, and possessed work experience as a cleaner/housekeeper. (Tr. 25, 63, 70, 77, 85-86.) Weaver-Shelton asserts that she is disabled due to bipolar disorder. (Opening Br. 2.)

At the time of the hearing, Weaver-Shelton was incarcerated at Madison Correctional

---

[2] The administrative record in this case consists of 326 pages. In the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

2

Facility, a minimum-security facility, serving a ten-year sentence for drug-related offenses. (Tr. 135, 311.) She stated that she had been off her medication for the past two years, that is, since 2005, because the prison told her that she did not need the medication despite her protests to the contrary. (Tr. 313.) Weaver-Shelton also reported that she got "fired" from a job at the prison because she wandered away from the job site. (Tr. 311-12, 315.) She further stated that prior to her incarceration she was terminated from a cleaning job because she was afraid to leave her house. (Tr. 316.)

## B. *Summary of the Medical Evidence*

On January 31, 2001, Weaver-Shelton was evaluated by D. Cooper, a licensed clinical social worker, due to claims of paranoia and hearing voices. (Tr. 140-43.) She told Mr. Cooper that she was addicted to crack cocaine and that she had attended Alcoholics Anonymous and Narcotics Anonymous meetings in the past but they did not help. (Tr. 141.) On mental status exam, Weaver-Shelton appeared unkempt, depressed, labile, expressed suicidal ideation, had fair judgment and insight, good memory, and a fair capacity for daily living tasks. (Tr. 141.) Mr. Cooper diagnosed her with bipolar disorder, mixed with psychosis, and assigned her a current Global Assessment of Functioning ("GAF") score of 55 with a past-year GAF of 60.[3] (Tr. 141.)

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id*. A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

She missed numerous subsequent appointments with Mr. Cooper in 2001, though she called several times with various complaints. (Tr. 146-47.)

In January 2003, Weaver-Shelton was admitted to St. Joseph Hospital for complaints of depression. (Tr. 157-60.) She had been using crack cocaine and was fearful of having a dirty urine drop and going back to prison. (Tr. 159.) Dr. Bryan Flueckiger evaluated her mental status, noting that her statements were very contradictory but also that she was upset and desperate for treatment. (Tr. 159.) He found that she was irritable, had poor insight and judgment, exhibited intellect in the low average range, was medication-seeking, and that her affect ranged from very flat to tearful. (Tr. 160.) He also noted that her anxiety increased the longer they talked but that her memory was intact. (Tr. 160.) He diagnosed her with cocaine dependence; depression, NOS; and personality disorder, NOS. (Tr. 160.) He rated her current GAF at 20 with a GAF for the last year of 40. (Tr. 160.) He opined that her prognosis was guarded. (Tr. 160.)

In March 2003, Weaver-Shelton was incarcerated at the Rockville Correctional Facility, and the next month she underwent a psychological examination. (Tr. 168.) The mental status examination was normal, and the physician continued her on Risperdal. (Tr. 179.) Soon thereafter she requested to go off her medications and to start group therapy. (Tr. 180.) On May 9, 2003, she reported that she was handling the discontinuation of her medicines just fine, noting that she was emotional but adequately coping. (Tr. 182.) She started to attend group therapy weekly in May 2003; she was usually described as normal and stable. (Tr. 183-98.) In July 2003, the psychiatric staff called Park Center to schedule appointments for a partial hospitalization program after her release from prison in August. (Tr. 193.)

4

On May 14, 2004, Weaver-Shelton saw Dr. Mahender Surakanti, a psychiatrist, reporting that she had been off her medications since she was in prison but that she felt she needed to go on them again. (Tr. 208-18.) He diagnosed her with bipolar disorder and polysubstance abuse. (Tr. 214.) Dr. Surakanti prescribed medications and assigned her a current GAF of 40-45. (Tr. 215.) She saw Dr. Surakanti again in February and reported that she was still depressed and that she had not been taking her Lexapro. (Tr. 215.) She returned the next month, complaining that she was still depressed and felt paranoid. (Tr. 217.) He adjusted her medications. (Tr. 217.)

On March 30, 2004, Dr. Sherwin Kepes performed a mental status examination at the request of the Social Security Administration. (Tr. 219-22.) She told Dr. Kepes that she was addicted to crack cocaine and that she had used within the last week. (Tr. 220.) Dr. Kepes noted that her dress and grooming were marginally adequate and that she was not very articulate but yet sufficiently responded to questions. (Tr. 220.) She appeared both agitated and depressed, but Dr. Kepes believed that some of her depression and agitation may have been related to her drug addiction and cravings. (Tr. 220, 222.) She became tearful during the evaluation but denied any suicidal ideation. (Tr. 220.) He concluded that her general judgment, common sense, and ability to interpret proverbs were not well developed. (Tr. 221.) Dr. Kepes diagnosed her with cocaine dependence; major depressive disorder, recurrent, moderate; and rule out borderline intellectual functioning. (Tr. 222.) He rated her current GAF at 50. (Tr. 222.)

On April 7, 2004, Dr. D. Unversaw, a state agency psychologist, reviewed Weaver-Shelton's record and concluded that she had marked limitation in performing activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. 224-36.) However, he was unable to assess her underlying mental health issues given her drug

use. (Tr. 236.)

On June 30, 2004, Weaver-Shelton saw Dr. Surakanti for a follow-up visit. (Tr. 243.) He adjusted her medications and rated her current GAF at 40-50. (Tr. 243.)

On August 20, 2004, Dr. B.R. Horton, a state agency psychologist, reviewed Weaver-Shelton's record and assessed the mental impairments arising from her bipolar disorder. (Tr. 254-63.) He concluded that as a result of her bipolar disorder she had a moderate degree of limitation in maintaining social functioning and concentration, persistence, or pace. (Tr. 254-63.) Dr. Horton opined that despite these limitations, she retained the ability to perform simple, repetitive tasks without special considerations. (Tr. 248.)

On March 21, 2005, Weaver-Shelton was again incarcerated and received a mental health screening by the Indiana Department of Correction. (Tr. 294.) The evaluation reflected that she was cooperative, her speech clear and relevant, her mood euthymic, and her affect appropriate. (Tr. 297.) The interviewer further noted that Weaver-Shelton's memory was intact and that her concentration was normal. (Tr. 297.) She was diagnosed with bipolar disorder and cocaine dependence, and was assigned a GAF of 55, reflecting moderate symptoms. (Tr. 294.)

Weaver-Shelton received psychological counseling in prison from March through July 2005. (Tr. 269-89.) The counseling notes indicate that her cocaine dependence was in remission while she was incarcerated. (Tr. 273.) On March 27, 2005, Weaver-Shelton's affect was described as within normal limits and her bipolar disorder stable. (Tr. 286.) On April 11, 2005, she reported that she was doing well without medication, that her depression and irritability had decreased, and that she would like to continue without medication. (Tr. 285.) She was described as pleasant, staying out of trouble, and with no suicidal ideation. (Tr. 285.) A few weeks later

6

Weaver-Shelton reported that her depression had increased and that she needed her medication. (Tr. 284.) Nonetheless, on June 23, 2005, she reported that she was again doing better, that her depression had decreased, and that she had no suicidal ideation. (Tr. 283.) Her group therapy notes from May through July 2005 generally reflect that Weaver-Shelton was "doing okay", that her activities of daily living were good, that her condition was stable, and that she was not having any problems in her correctional facility unit. (Tr. 272-73.)

The record does not reflect that Weaver-Shelton received psychiatric treatment beyond July 2005, as the record contains no psychiatric treatment notes from 2006 or 2007.

## IV. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial

evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id*.

## V. ANALYSIS

### *A. The Law*

Under the Act, a plaintiff is entitled to SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

In determining whether Weaver-Shelton is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See* 20 C.F.R. § 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 416.920(e), 416.945. The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 416.920(e), 416.945(a)(5).

every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

Notwithstanding the foregoing, a claimant is not disabled if her drug or alcohol abuse is a "contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 1382c(a)(1)(J); 20 C.F.R. § 416.935(a); *Williams v. Astrue*, No. 1:06-cv-1444, 2007 WL 2362978, at *5 (S.D. Ind. Aug 13, 2007). In such cases, the ALJ first makes his disability determination under the five step process. 20 C.F.R. § 416.935(b); *Sparks v. Astrue*, No. 3:08-cv-210, 2009 WL 2914106, at *6 (N.D. Ind. Sep. 3, 2009). If the ALJ finds that the claimant is disabled, he must next decide which of the claimant's limitations would remain absent the substance abuse. 20 C.F.R. § 416.935(b). The ALJ must then determine which, if any, of the remaining limitations would be disabling on their own. *Id.*; *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006) ("When an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the [ALJ] is whether, were the applicant not a substance abuser, she would still be disabled.").

## B. The ALJ's Decision

On June 21, 2007, the ALJ rendered his decision. (Tr. 24-30.) He found at step one of the five-step analysis that Weaver-Shelton had not engaged in substantial gainful activity since her alleged onset date and at step two that her history of cocaine dependence and bipolar/major depressive disorder were severe impairments. (Tr. 29.) At step three, he determined that when Weaver-Shelton's substance abuse is considered, her impairments meet the requirements of Listing 12.09, Substance Addiction Disorders. (Tr. 29.) However, he further concluded that in the absence of substance abuse, her impairment or combination of impairments was not severe enough to meet a listing. (Tr. 29.)

9

Before proceeding to step four, the ALJ found Weaver-Shelton's testimony as "generally credible but not persuasive as to disability" (Tr. 29) and assigned her the following RFC:

> She has no physical limitations. The claimant can perform work that does not involve public contact and that consists of routine, repetitive tasks. She can work for stretches of 2 hours, but needs to take a short break of 10 to 15 minutes between each stretch of work.

(Tr. 28.) Based on this RFC and the VE's testimony, the ALJ determined at step four that Weaver-Shelton was able to perform her past relevant work as a cleaner/housekeeper. (Tr. 28-29.) In addition, he proceeded to step five where he concluded that Weaver-Shelton could also perform a significant number of other jobs within the general economy, including kitchen helper (300,000 jobs nationally), assembler (675,000 jobs nationally), and packing line worker (250,000 jobs nationally). (Tr. 28.) Therefore, Weaver-Shelton's claim for SSI was denied. (Tr. 30.)

### C. *The ALJ's Step Three Determination Is Supported by Substantial Evidence*

First, Weaver-Shelton argues that the ALJ erred in concluding at step three that she did not meet or equal a listing absent her substance abuse. Contrary to Weaver-Shelton's assertion, the ALJ's step three finding is supported by substantial evidence.

The listings describe impairments that are considered presumptively disabling when specific criteria are met. *See* 20 C.F.R. § 416.925(a). To meet or equal a listed impairment, a claimant must satisfy all of the criteria set forth in the listing. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). The burden of proving that her condition meets or equals a listed impairment rests with the claimant. *Id.*; *see also Shinaberger v. Barnhart*, No. 1:05-cv-0276-DFH-TAB, 2006 WL 3206338, at *11 (S.D. Ind. Mar. 31, 2006) ("In demonstrating medical equivalence, the claimant has the burden of presenting 'medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" (quoting *Sims v. Barnhart*, 309 F.3d

424, 428 (7th Cir. 2002))). Yet, the Seventh Circuit Court of Appeals has stated that although the burden of proof rests with the claimant, an ALJ "should mention the specific listing he is considering and his failure to do so, if combined with a 'perfunctory analysis,' may require a remand." *Ribaudo v. Barnhart*, 458 F.3d 580, 583-84 (7th Cir. 2006) (citing *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003)); *see also Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

Here, the ALJ penned approximately two pages about his step three decision, specifically identifying Listing 12.04, Affective Disorders, and Listing 12.09, Substance Addiction Disorders. (Tr. 27.) To satisfy the "paragraph B" criteria of either Listing, a claimant must show that her mental impairments result in at least two of the following: marked restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Tr. 13); *see* 20 C.F.R. § 404, Subpt. P, App. 1, §§ 12.00C (stating that a "marked" limitation means "more than moderate but less than extreme"), 12.04B, 12.09B.

Ultimately, the ALJ concluded that when Weaver-Shelton is using cocaine, the severity of her impairments meet the requirements of Listing 12.09. In reaching this conclusion, the ALJ relied upon the opinion of Dr. Unversaw, a state agency psychologist, who concluded that Weaver-Shelton met Listing 12.09 because she had marked difficulties in performing activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence or pace. (Tr. 27); *see* 20 C.F.R. § 416.927(f)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians and psychologists who are also experts in Social

11

Security disability evaluation."); *Dixon*, 270 F.3d at 1177 ("[T]he claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise.").

The ALJ next analyzed whether Weaver-Shelton's substance abuse was a contributing factor material to the finding of disability–that is, whether she would still be found disabled if she stopped the substance abuse. (Tr. 27.) The ALJ concluded that her substance abuse was indeed material to the finding of disability. In doing so, he relied upon the opinion of Dr. Horton, a state agency psychologist, who completed a psychiatric review technique assessing the severity of Weaver-Shelton's impairments arising solely from her bipolar syndrome. (Tr. 27); *see* 20 C.F.R. § 416.927(f)(2)(i); *Dixon*, 270 F.3d at 1177. Dr. Horton found that this resulted in only a mild restriction in activities of daily living; moderate difficulty in maintaining social functioning; and moderate difficulty in maintaining concentration, persistence or pace. Therefore, the ALJ concluded that Weaver-Shelton did not satisfy the criteria of Listing 12.04 in the absence of substance abuse.

The ALJ further emphasized, and properly so, that he found Dr. Horton's opinion to be corroborated by the other evidence of record. (Tr. 27.) He noted Weaver-Shelton's long history of drug use and dependence, multiple incarcerations for drug-related offenses, that she is an admitted crack addict, and that on several occasions she was diagnosed with solely cocaine dependence. (Tr. 27.) The ALJ also observed that the evidence shows that Weaver-Shelton improves significantly when she is incarcerated and no longer able to use drugs. (Tr. 27.)

In that vein, the ALJ explained that Weaver-Shelton's psychiatric records during her 2003 incarceration show that she participated in group therapy, that her mood was euthymic and

her affect was appropriate for her mood, and that she had no hallucinations or delusions. (Tr. 27.) The ALJ further noted that since her 2005 incarceration, Weaver-Shelton received a GAF score of 55 indicating moderate symptoms, her affect has been described as within normal limits and her bipolar disorder as "stable", and she often reported that she was "doing better". (Tr. 27.)

In fact, the record shows that Weaver-Shelton voluntarily chose to forego her medications since her 2005 incarceration and, though she had some period of exacerbation, for the most part she significantly improved even without medication. (Tr. 27); *see* 20 C.F.R. § 416.929(c)(3) (instructing the ALJ to consider the claimant's use of medication when determining the severity of her subjective symptoms); SSR 96-7p; *see generally Adams v. Astrue*, No. 2:08 cv 79, 2009 WL 2986966, at *13 (N.D. Ind. Sep. 14, 2009) ("An ALJ may conclude that a person has a history of impairments but that the impairment is not so severe as to be disabling, especially in light of the claimant's ability to function when undergoing treatment or medication management.") (citing *Skinner v. Astrue*, 478 F.3d 836, 845 (7th Cir. 2007)). The ALJ also observed that there were no psychiatric records from 2006 or 2007 and reasonably inferred that Weaver-Shelton was no longer receiving psychiatric services while she was incarcerated. (Tr. 27); *see* 20 C.F.R. § 416.929(c)(3) (instructing the ALJ to consider the treatment that the claimant has received in determining the severity of her subjective complaints); SSR 96-7p.

Thus, in arriving at his step-three determination, the ALJ relied upon the assessment of the state agency physicians, who completed Disability Determination and Transmittal forms at the initial and reconsideration levels and concluded that Weaver-Shelton was not disabled. (Tr. 36, 37.) The Seventh Circuit Court of Appeals has stated that "[t]hese forms conclusively

establish that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (internal quotation marks and citations omitted). Consequently, "[t]he ALJ may properly rely upon the opinion of these medical experts." *Id*. (citing *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990)); *see also* SSR 96-6p.

Therefore, the ALJ's step three finding that Weaver-Shelton does not satisfy a listing absent her substance abuse is supported by substantial evidence.

### D. *The ALJ's Step Four Determination Is Supported by Substantial Evidence*

Next, Weaver-Shelton argues that the ALJ erred at step four in determining that she was capable of performing her past relevant work as a cleaner/housekeeper. Specifically, she alleges that the ALJ failed to comply with Social Security Ruling 82-62, which requires the ALJ to make a finding of fact concerning: (1) the individual's RFC; (2) the physical and mental demands of the past occupation; and (3) that the individual's RFC would permit a return to her past occupation. Weaver-Shelton's argument centers on the second requirement–the physical and mental demands of her past occupation as a cleaner/housekeeper.

As Weaver-Shelton sees it, it was improper for the ALJ to rely upon the VE's testimony "as a substitute for the function by function analysis required by the ruling and regulations." (Opening Br. 17.) She points out that during the application process she completed two forms describing her work as an office cleaner. In the first form she indicated that she supervised people on the job and in the second form she stated that she did not. (*Compare* Tr. 72, *with* Tr. 86.) She emphasizes that if she did supervise people, she would not be able to perform her past

14

relevant work since the ALJ limited her to routine, repetitive tasks. Citing a Tenth Circuit Court of Appeals case, *Winfrey v. Chater*, 92 F.3d 1017, 1024 (10th Cir. 1996), Weaver-Shelton contends that the ALJ, not the VE, should have resolved this conflict.

Weaver-Shelton's argument is unpersuasive. An ALJ is entitled to rely upon the testimony of a VE to support his finding at step four that a claimant is capable of performing her past relevant work. *See, e.g.*, *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003) (explaining that an ALJ is entitled to rely upon a VE's opinion to support his step four finding). Furthermore, during the hearing the ALJ solicited testimony from Weaver-Shelton about her past work as she actually performed it and from the VE regarding the functional requirements of a cleaner/housekeeper as it is customarily performed in the national economy. (*See* Tr. 315-16, 318-19.) Social Security Ruling 82-61 specifically states that an ALJ may utilize the services of a VE to resolve inconsistencies between a claimant's description of her past work and the descriptions shown in the Dictionary of Occupational Titles.

In any event, "the ALJ need not conclude that the claimant is capable of returning to the precise job [she] used to have; it is enough that the claimant can perform jobs substantially like that one." *Getch v. Astrue*, 539 F.3d 473, 482 (7th Cir. 2008). In that vein, Social Security Ruling 82-61 states:

> A former job performed . . . by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. . . . [I]f the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be 'not disabled.'

*See Smith v. Barnhart*, 388 F.3d 251, 253 (7th Cir. 2004). Thus, even if Weaver-Shelton's past

15

job involved supervision of other employees, the VE's testimony that a hypothetical individual with Weaver-Shelton's limitations could perform the job of cleaner/housekeeper as generally performed in the national economy was sufficient to support the ALJ's step four finding.

Moreover, despite the conflicting information on the check-the-box occupational forms in the record, Weaver-Shelton never suggested at the hearing that her past work included supervising others. (Tr. 315-16.) Nor did she object when the VE later reiterated her description of her past work as a cleaner/housekeeper. (*See* Tr. 318-19.) "[A]n ALJ is entitled to presume that a claimant represented by counsel in the administrative hearings has made [her] best case." *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988).

Therefore, Weaver-Shelton's second argument also fails to warrant a remand of the Commissioner's final decision.

*E. The ALJ Adequately Reviewed the Evidence In Assigning an RFC*

Weaver-Shelton also asserts that the ALJ erred in assigning great weight to the opinion of Dr. Horton, the state agency psychologist who reviewed her record and assessed her mental impairments in the absence of substance abuse. In advancing this argument, Weaver-Shelton contends that the ALJ and Dr. Horton selectively reviewed the evidence by failing to consider the third party function reports of Weaver-Shelton's mother and daughter detailing her difficulty with daily life tasks.

However, in that respect, "the ALJ is not required to discuss every piece of evidence but is instead required to build a logical bridge from the evidence to [his] conclusions." *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). That is, "[i]f the ALJ were to ignore an entire line of evidence, that would fall below the minimal level of articulation required." *Carlson v. Shalala*,

999 F.2d 180, 181 (7th Cir. 1993).

Here, the ALJ did not ignore an entire line of evidence or fail to build a logical bridge between the evidence and his conclusion. The written reports of Weaver-Shelton's mother and daughter "essentially corroborated [Weaver-Shelton's] account of [her symptoms] and [her] daily activities" in that they described her difficulties with focus and concentration. *Carlson*, 999 F.2d at 181. Thus, they were "essentially redundant" of Weaver-Shelton's own testimony about her functional limitations. *Id.* The Seventh Circuit Court of Appeals has stated that where testimony is "redundant", an ALJ need not independently evaluate it, since the testimony does not constitute a separate line of evidence. *Books v. Chater*, 91 F.3d 972, 980 (7th Cir 1996); *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *Carlson*, 999 F.2d at 181; *Brandenburg v. Social Sec. Admin.*, No. 1:04-CV-01376-DFH-WTL, 2005 WL 2148119, at *6 (S.D. Ind. Aug. 2, 2005). Consequently, Weaver-Shelton's request for a remand based on the ALJ's alleged selective review of the evidence is without merit.

*F. The ALJ's Credibility Determination Will Not Be Disturbed*

Finally, Weaver-Shelton argues that the ALJ improperly evaluated her credibility, advancing two points in this respect. First, she contends that the ALJ misunderstood her testimony about wandering from a job site at the prison, and second, she reiterates her assertion that the ALJ and Dr. Horton selectively reviewed the evidence. (Opening Br. 19.)

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see*

*Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, the ALJ found Weaver-Shelton's testimony "generally credible but not persuasive as to disability." (Tr. 27.) In doing so, the ALJ provided at least four reasons for his determination, all of which are ultimately supported by the record. As explained above, Weaver-Shelton challenges only two of the ALJ's reasons.

First, the ALJ observed that Weaver-Shelton's testimony did not necessarily align with the medical record. That is, the ALJ noted that Weaver-Shelton testified that she was not given medication in prison because the prison officials believed that she has no psychiatric impairments. (Tr. 313.) However, the records prove otherwise. They show that she voluntarily chose to forgo her medication early in her incarceration. (Tr. 180, 182, 285); *see, e.g.*, *Kornfield v. Apfel*, No. 00 C 5642, 2003 WL 103009, at *4 (N.D. Ill. Jan. 9, 2003) (discounting a claimant's credibility due to her inconsistent statements). Weaver-Shelton does not challenge the ALJ's reasoning in this respect.

The ALJ also observed that the objective medical evidence does not support her testimony of disability. As discussed earlier, the ALJ pointed out that though the medical progress notes indicated that she had some exacerbation of her symptoms intermittently, she greatly improved even without medications when she was incarcerated and her drug use was in

18

remission. (Tr. 28); *see Powers*, 207 F.3d at 435 (discounting a claimant's credibility due to discrepancies between her allegations and the objective medical evidence). The ALJ further noted that there are no psychiatric records from 2006 and 2007 to substantiate Weaver-Shelton's claims of symptoms during that time period, which further undercuts her claim of disability. (Tr. 28); *Powers*, 207 F.3d at 435. Thus, the ALJ reasonably concluded that the records show a significant improvement in Weaver-Shelton's level of functioning when she is abstaining from drug use, another finding that Weaver-Shelton does not directly contest with respect to the ALJ's credibility finding.

Weaver-Shelton does, however, challenge the ALJ's discounting of her statement that during her incarceration she could not work because she wandered away from job sites. The ALJ did not find this statement particularly credible, deducing that Weaver-Shelton would not likely be eligible for a minimum-security prison if she wandered from assigned job sites. (Tr. 28.) Weaver-Shelton criticizes the ALJ's reasoning in this respect, suggesting that the ALJ "did not understand the testimony". (Opening Br. 19.) Nonetheless, the ALJ is entitled to make reasonable inferences from the evidence before him, and the inference he drew here was not unreasonable. *See Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (acknowledging that an ALJ is entitled to make reasonable inferences from the evidence before him).

The ALJ also cited Dr. Horton's opinion in discounting Weaver-Shelton's subjective report of disability. Weaver-Shelton reiterates her argument that the ALJ and Dr. Horton selectively reviewed the evidence by failing to consider the third party function reports of her mother and daughter. But as concluded earlier, the ALJ did not err in discussing these reports because they were "essentially redundant" of Weaver-Shelton's own description of her

19

impairments, and thus did not constitute a separate line of evidence. *Carlson*, 999 F.2d at 181.

In sum, the ALJ adequately built an accurate and logical bridge between the evidence of record and his conclusion that Weaver-Shelton's testimony of debilitating limitations "was not persuasive as to disability", and his determination is not "patently wrong." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will not be disturbed. [5]

## VI. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Weaver-Shelton.

SO ORDERED.

Enter for this 4th day of February, 2010.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge

---

[5] Because the ALJ's step four finding that Weaver-Shelton could perform her past relevant work as a cleaner/housekeeper is supported by substantial evidence, the Court need to reach her remaining argument concerning the ALJ's alternative step five finding.